**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————————

TARITA OWENS,

                    Plaintiff,

          v.                                        1:24-cv-1037 (AMN/MJK)

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, MARIA HERMAN,

                         Defendants.

———————————————————————

**APPEARANCES:**                              **OF COUNSEL:**

**TARITA OWENS**
342 Madison Ave E
Rensselaer, New York 12144
Plaintiff, *pro se*

**HON. LETITIA JAMES**                        **LELA M. GRAY, ESQ.**
New York State Attorney General
The Capitol
Albany, New York 12224
*Attorneys for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.    **INTRODUCTION**

          On August 23, 2024, *pro se* Plaintiff Tarita Owens commenced this action against the New

York State Department of Corrections and Community Supervision ("DOCCS") and Maria

Herman pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"). *See* Dkt. No. 1

("Complaint"). On October 15, 2024, Defendants moved to dismiss the Complaint pursuant to

Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  *See* Dkt. No. 15-4 at 9 (the "Motion").[1]  On October 28, 2024, Plaintiff filed a response in opposition to the Motion, *see* Dkt. No. 16, and on November 12, 2024, Defendants filed a reply in further support of the Motion, *see* Dkt. No. 18.  Without leave of Court, Plaintiff filed a second "response" to Defendants' reply on November 25, 2024.  The Motion is now ripe for adjudication.

For the reasons that follow, the Motion is granted in part and denied in part.

## II.    BACKGROUND

Unless otherwise noted, the following facts are drawn from the Complaint, its attachments, or materials it incorporates by reference, and Plaintiff's opposition to Defendants' motion to dismiss.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (On a motion  to dismiss, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference" (citation omitted)); *see also Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."); *Sommersett v. City of New York*, No. 09-CIV-5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) ("[W]here a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." (citation omitted)).  The allegations are assumed to be true for purposes of ruling on the Motion, *see Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (*per curiam*), or are otherwise matters of public record, *Williams v. N.Y.C. Hous. Auth.*, 816 Fed. Appx. 532, 534 (2d Cir. 2020).

---

[1] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

Throughout her submissions, Plaintiff provides what amounts to a near daily accounting of her experiences at DOCCS. The Court recounts the allegations in chronological order.

## A. Allegations Preceding First Reporting Activity[2]

Plaintiff is female and Hispanic. Dkt. No. 1 at 6 ¶ 1. On or about August 21, 2021, Plaintiff received a job offer for the position of Equal Opportunity Specialist 1 ("EOS1") with DOCCS. Dkt. No. 16 at 9. Defendant Herman, the Director of the Office of Diversity and Inclusion ("ODI"), conveyed the offer through a phone call. Dkt. No. 1 at 6 ¶ 2. During the same call, the Complaint alleges that Defendant Herman told Plaintiff that she was not Defendant Herman's first choice for the EOS1 position, and that she had to be convinced to hire Plaintiff. *Id.* After the call, and in a separate email, Plaintiff asked Defendant Herman to be considered for a recently vacant EOS3 position that Defendant Herman had mentioned during the phone call. *Id.* at 6 ¶ 3. Defendant Herman told Plaintiff that she could not be considered because "she had not been in state service for one year[,]" the position had yet to be posted, and that "there was a process set by Civil Service" which Plaintiff had not complied with prior to seeking the position. *Id.* Plaintiff alleges that Defendant Herman did not impose the same requirements in relation to other vacancies, including the vacancy left by Plaintiff's own resignation. *Id.*; *id.* at 17 ¶ 57.

Plaintiff officially began her employment on September 2, 2021. *Id.* at 3; Dkt. No. 16 at 4 ¶ 2. Nearly immediately, the Complaint alleges that Defendant Herman "would compare Plaintiff to an Asian Administrative Assistant 1 (AA1) employee named Sanna Thalho[,]" who was hired at the same time as Plaintiff, on an almost daily basis. *Id.* at 6 ¶ 4. Plaintiff alleges that these comparisons were "divisive, isolating, toxic, and created a hostile working environment." *Id.*

---

[2] The Court notes that these allegations may not be considered in assessing whether Plaintiff has sufficiently stated a Title VII retaliation claim because they pre-date the first alleged instance of protected activity. They remain relevant to Plaintiff's other claims.

During a September 7, 2021 meeting, five days after Plaintiff started working at DOCCS, the Complaint alleges that Defendant Herman frequently praised Ms. Thalho and other employees while offering no attention or praise to Plaintiff. *Id.* at 6 ¶ 5. Defendant Herman also trivialized Plaintiff's questions during the meeting but responded with enthusiasm and positivity when Ms. Thalho asked similar questions. *Id.* The next day, Plaintiff alleges that Defendant Herman belittled Plaintiff's work product and declared that Ms. Thalho "can complete tasks better than the Plaintiff." *Id.* at 6 ¶ 6.

Plaintiff also asserts that on September 16, 2021, Defendant Herman excluded Plaintiff from a meeting regarding a Hispanic Heritage Month Celebration. *Id.* at 6-7 ¶ 7. Ms. Thalho was included in the meeting. *Id.* Instead of attending the meeting, Defendant Herman required Plaintiff to stay in the office to answer phone calls. *Id.* However, the Complaint alleges that answering phones was a primary function of Ms. Thalho's job as an Administrative Assistant. *Id.* Plaintiff also alleges that even after Defendant Herman became aware that "phone coverage was [otherwise] available[,]" Plaintiff was not permitted to participate. *Id.*

Soon after, on September 20, 2021, Defendant Herman brought her family to the office. *Id.* at 7 ¶ 8. The Complaint alleges that Defendant Herman introduced the family to other employees in the office yet largely ignored Plaintiff. *Id.* Plaintiff alleges that Defendant Herman expressed a desire to introduce the family to Ms. Thalho as well, but Ms. Thalho was not present. *Id.*

On September 22, 2021, ODI held another meeting to discuss the Hispanic Heritage Month celebration. *Id.* at 7 ¶ 9. After not receiving confirmation on whether she should attend, Plaintiff arrived at the meeting and alleges that Defendant Herman was "visibly annoyed and frustrated" while conducting the meeting and that she was, again, dismissive of Plaintiff's feedback. *Id.*

The next day, on September 23, 2021, Plaintiff alleges that Defendant Herman gave Plaintiff and Ms. Thalho an assignment. *Id.* at 7-8 ¶ 10. Plaintiff questioned whether there was a more efficient method for completing the assignment than the one Defendant Herman suggested. *Id.* In response, Defendant Herman yelled at Plaintiff and said that she had "a problem with listening [and] trying to change things" and that Plaintiff needed to stay in her place. *Id.* Plaintiff alleges that the confrontation took place in front of Ms. Thalho and neighboring staff of other departments. *Id.* Ultimately, Plaintiff alleges that her concerns about efficiency and redundancy were proven correct, yet Defendant Herman refused to acknowledge Plaintiff's attempted contribution. *Id.* Plaintiff discussed Defendant Herman's behavior with Elaine Grant, her supervisor, and Ms. Grant suggested that Plaintiff report the behavior. *Id.*

On September 24, 2021, Defendant Herman apologized for the confrontation. *Id.* at 8 ¶ 11. However, Defendant Herman also conveyed that "it was brought to her attention" that Plaintiff's performance was inadequate and that she "was not working to the level of an 18." *Id.* Plaintiff alleges that Defendant Herman was unable to point to any specific deficiencies in her work. *Id.* Plaintiff also alleges that Defendant Herman responded by asserting that Ms. Thalho "was able to complete different assignments faster and better than Plaintiff." *Id.* Plaintiff then asked Defendant Herman why she refused to "offer anything positive" about Plaintiff in staff meetings, and Defendant Herman responded that "there isn't anything positive about the Plaintiff." *Id.* After Plaintiff became visibly upset and exited the conversation, Plaintiff alleges that Defendant Herman called her back to her office and explained that "she could get rid of Plaintiff if she wanted to after two months." *Id.*

### B. Allegations Subsequent to First Reporting Activity

A few days later, on October 1, 2021, Plaintiff attended a meeting with Defendant Herman's supervisor, Mr. McKay. *Id.* at 8-9 ¶ 12. Plaintiff informed Mr. McKay of her concerns

regarding Defendant Herman's behavior. *Id.* Mr. McKay allegedly told Plaintiff that her interactions with Defendant Herman "seemed like personal attacks" that were "not related to legitimate work related concerns[,]" and apologized for Defendant Herman's behavior. *Id.* Mr. McKay set up a follow-up meeting on October 15, 2021 to assess whether Defendant Herman's behaviors had changed and sent Plaintiff an email reiterating his apologies. *Id.*; Dkt. No. 1-2 at 1. Generally, Plaintiff asserts that Defendant Herman's behavior worsened after the October 1, 2021 meeting. Dkt. No. 16 at 27.

On October 4, 2021, Plaintiff alleges that Defendant Herman instructed Ms. Grant, Plaintiff's supervisor, to "verbally counsel" Plaintiff regarding an email greeting. Dkt. No. 1 at 9 ¶ 13.[3] Plaintiff wrote "Good morning" instead of "Good morning, Maria," in an email, and Defendant Herman asserted that the greeting was disrespectful. *Id.*

The next day, on October 5, 2021, in a meeting with Defendant Herman, Plaintiff shared that she thought ODI could benefit from clearer and more concise communication. *Id.* at 9 ¶ 14. Plaintiff pointed out that during an event for Hispanic Heritage Month, conflicting information was given to different employees. *Id.* Defendant Herman became defensive, raised her tone of voice, and accused Plaintiff of not telling the truth. When Plaintiff confronted Defendant about her tone, Defendant Herman "changed to a condescendingly soft tone." *Id.* After learning that Plaintiff had requested another meeting with Defendant Herman's supervisor to discuss the incident the next day, Defendant Herman told Ms. Grant to " informally counsel" Plaintiff again. Plaintiff was told that she should be more respectful. *Id.* at 9 ¶ 15.

---

[3] The Complaint initially characterizes this interaction as "discipline." *Id.* However, as discussed below, the Court concludes that counseling, as used by ODI, is not a form of discipline.

On October 7, 2021, Ms. Grant sent Plaintiff an email complaining that Ms. Thalho was "asking the same questions over and over again." *Id.* at 9 ¶ 16. Plaintiff alleges that Ms. Grant's complaints demonstrate that Defendant Herman's unfavorable comparisons of Plaintiff and Ms. Thalho were unfounded, and that she was unfairly labeled "incompetent." *Id.*

From October 6, 2021 to October 14, 2021, Plaintiff alleges that Defendant Herman would greet, communicate with, and interact with everyone in the office except for Plaintiff. *Id.* at 9 ¶ 17. Plaintiff alleges that Defendant Herman "would walk pass Plaintiff as if she wasn't there." *Id.* On October 15, 2021, Plaintiff attended the planned follow up meeting with Mr. McKay and informed him that Defendant Herman's behavior had worsened. *Id.* at 10 ¶ 18. Mr. McKay informed Plaintiff that he would speak to Defendant Herman about her behavior toward Plaintiff. *Id.*; *see also* Dkt. No. 1-2 at 8-9.

About a week later, on October 22, 2021, Plaintiff applied for an EOS2 position that was officially posted. *Id.* at 10 ¶ 19. Plaintiff told her supervisor, Ms. Grant, that she had applied, and Ms. Grant allegedly replied that "[Defendant Herman] will see to it that the Plaintiff never receives a fair review or consideration for the position." *Id.* Ms. Grant also said that Defendant Herman had made up excuses to not consider other employees for advancement in the past. *Id.* On November 15, 2021, Mr. McKay told Defendant Herman that he "would like to see [Plaintiff's] resume" and that "not granting her an interview will create further moral concerns." *Id.* at 10 ¶ 22. According to the Complaint, Defendant Herman advocated for bypassing interviews for the EOS2 position because Plaintiff had been referred by Human Resources for an interview. *Id.* The Complaint asserts that Plaintiff was not offered an interview and was not given the EOS2 position. *Id.*

On November 4, 2021, Plaintiff was tasked with reviewing the grievances of incarcerated individuals as part of a committee, and she asked Ms. Grant to review questions she planned to ask at an upcoming committee meeting regarding a particular case. *Id.* at 10 ¶ 20. Ms. Grant affirmed the validity of Plaintiff's questions, and therefore, Plaintiff raised them at the committee meeting. *Id.* In response, Plaintiff was referred to meet with Director of Ministerial Services Nancy Fernandez, who had previously reviewed the case in question. *Id.*; Dkt. No. 1-2 at 10.

After meeting with Ms. Fernandez, on November 8, 2021, Ms. Grant informed Plaintiff that she would be formally counseled. *Id.* at 10 ¶ 21. Plaintiff believed the rationale for the formal counseling, which related to Plaintiff's conversation with Ms. Fernandez, was a misunderstanding, but she was not provided an opportunity to speak with Defendant Herman or Ms. Fernandez prior to the counseling. *Id.* On November 29, 2021, after seeking a meeting with Mr. McKay to discuss the formal counseling, Plaintiff was told to instead discuss the issue with Defendant Herman, and that "counseling is not discipline." *Id.* at 11 ¶ 25. Plaintiff eventually met with Defendant Herman, but Defendant Herman allegedly ignored Plaintiff's explanation of the misunderstanding and opted to formally counsel Plaintiff. *Id.* at 11 ¶¶ 25-28.

On November 17, 2021, Plaintiff was asked to complete a memo for an investigation concerning employees coming to work with COVID symptoms. *Id.* at 10 ¶ 23. In the memo, Plaintiff mentioned that Defendant Herman was retaliating against Plaintiff. *Id.* On November 22, 2021, Plaintiff returned to work after having COVID, and the Complaint alleges that Defendant Herman repeatedly assessed Plaintiff by asking her if she had symptoms despite the fact that she was cleared to return to work by her provider, the Department of Health, and Human Resources. *Id.* at 10 ¶ 24. Plaintiff alleges that Defendant Herman never questioned other employees that were sick or displayed cold symptoms. *Id.*

On December 7, 2021, Plaintiff alleges that Ms. Grant informed her that Defendant Herman questioned whether Plaintiff was truly Hispanic because of her hair texture, skin complexion, last name, and proficiency in Spanish. *Id.* at 11 ¶ 29. Instead, Defendant Herman allegedly told Ms. Grant that she believed Plaintiff was black. *Id.* Ms. Grant also told Plaintiff that Defendant Herman looked up Plaintiff's demographics in the "Mainframe Database" to evaluate Plaintiff's identity. *Id.* Plaintiff alleges that the information in the Mainframe Database is privileged information and "contains protected class information." *Id.*

On December 8, 2021, Plaintiff again alleges that Defendant Herman refused to greet, look at, or speak to Plaintiff during a staff meeting unless it was necessary. *Id.* at 10 ¶ 30.

On December 9, 2021, a new employee, who was white, started in the vacant EOS3 position. *Id.* at 11 ¶ 31. Plaintiff alleges that Defendant Herman brought bagels and snacks to celebrate despite not doing so on Davon Williams, a black employee's, first day. *Id.* The new employee in the EOS3 position resigned merely two days later. *Id.* Plaintiff alleges that Defendant Herman pressed the new employee on his rationale for the resignation and asked him to reconsider. *Id.*

On December 17, 2021, Plaintiff received yet another notice that Ms. Grant had scheduled a formal counseling session, this time in relation to Plaintiff's experience with COVID. *Id.* at 11-12 ¶ 32. During the counseling session, Ms. Grant read off a piece of paper, which Plaintiff alleges was written by Defendant Herman, and informed Plaintiff that she had knowingly come into work on November 8 and November 9, 2021 with symptoms of COVID and had irresponsibly jeopardized coworkers' health. *Id.* Ms. Grant, reading from the pre-written material, also stated that Plaintiff was "blaming others for actions" including by filing "an OSI statement that [Defendant Herman] was retaliating against Plaintiff[,]" and that Plaintiff was asked to go home

9

when she had COVID but did not. *Id.* Plaintiff disputed this version of events, but Defendant Herman insisted on the formal counseling, saying that Human Resources had mandated it. *Id.* Plaintiff alleges that, in fact, the formal counseling was not mandated by Human Resources, and that the Director of Human Resources had informed Plaintiff that Defendant Herman asked several times if there was a way to formally counsel Plaintiff for having COVID. *Id.* at 13 ¶ 34. Plaintiff also alleges that Defendant Herman had discretion to rescind the formal counseling after the Director of Human Resources determined that counseling was not recommended, but no rescission occurred. *Id.* Plaintiff eventually emailed a formal memorandum objecting to the basis for the formal counseling to Ms. Grant. *Id.* at 14 ¶ 42; Dkt. No. 1-4 at 3-6.

On December 21, 2021, Plaintiff filed an internal discrimination, harassment, and retaliation claim with the Anti-Discrimination Investigation Department ("ADID") against Defendant Herman. *Id.* at 12 ¶ 33.

On December 31, 2021, Plaintiff alleges that Defendant Herman confronted her and claimed that she and Mr. Williams, another employee, conspired to divide work so that Ms. Thalho was left with the largest workload on a specific assignment. *Id.* at 13 ¶ 36. Plaintiff claims Defendant Herman "went out of her way to protect [Ms. Thalho]" and that the claims were incorrect. *Id.* In the end, Plaintiff alleges that she completed the largest portion of the assignment and assisted Ms. Thalho in completing her share. *Id.*

A few days later, on January 3, 2022, Plaintiff alleges that Defendant Herman informed Plaintiff's supervisor, Ms. Grant, that Plaintiff "need[ed] to make a decision to leave and if [Plaintiff] wo[uldn't] make a decision, [Defendant Herman] w[ould] make one for her." *Id.* at 13 ¶ 37. Plaintiff's supervisor informed her of the interaction, and Plaintiff felt her job was in jeopardy. *Id.*

On January 6, 2022, Plaintiff asserts that Defendant Herman introduced a new employee, Tonia Wheeler, to several employees. *Id.* at 14 ¶ 39. Plaintiff alleges that Defendant Herman's description of Ms. Thalho was "energetically doting," while the introductions with Plaintiff and Mr. Williams were less enthusiastic and emphasized their lack of experience in the office. *Id.*

On January 10, 2022, Ms. Grant gave Plaintiff her formal evaluation. *Id.* at 14 ¶ 40. Ms. Grant expressed hesitation because the evaluation had been edited by Defendant Herman to be more negative than Ms. Grant thought was accurate. *Id.* Ms. Grant allegedly told Human Resources that she was uncomfortable signing Plaintiff's evaluation. *Id.* Plaintiff eventually sent Ms. Grant a formal memorandum contesting the evaluation on February 7, 2022. *Id.* at 14 ¶ 42; *see* Dkt. No. 1-4 at 7-8. Also on January 10, 2022, Mr. McKay visited ODI, and Plaintiff informed him that the situation with Defendant Herman had not improved. *Id.* at 14 ¶ 40. Mr. McKay expressed that he would speak to Defendant Herman. *Id.*

Defendant Herman reassigned Ms. Wheeler to be Plaintiff's supervisor in place of Ms. Grant. *Id.* at 14 ¶ 41. According to Plaintiff, Ms. Wheeler informed Plaintiff that Defendant Herman gave "a very negative overview of the Plaintiff." *Id.* On April 11, 2022, Plaintiff was supposed to meet with Ms. Wheeler for a weekly check in. *Id.* at 15 ¶ 45. Ms. Wheeler was away at training for new employees, so Defendant Herman conducted the meeting instead. *Id.* At the end of the meeting, Defendant Herman allegedly told Plaintiff that a recent comment Plaintiff had made about doing the work of three employees due to vacancies in the office was untrue, and that Plaintiff was in fact only doing the work of two employees. *Id.* Plaintiff disputed this characterization in the meeting and alleges that Defendant Herman "went out of her way to . . . trivialize her work." *Id.*

On April 21, 2022, a new employee, Xiomara Tapia, started in the Department. *Id.* at 15 ¶ 47. During a group conversation, Defendant Herman said that Ms. Tapia and Plaintiff wore "inappropriate" pants and that they "need to cover their buttocks and thigh region with a larger item, such as a sweater or blazer." *Id.* Plaintiff alleges that she was "humiliated, objectified, and sexualized" by Defendant Herman because the conversation took placed in front of the whole department. *Id.* Later that day, Plaintiff noticed that Ms. Tapia was not being given instruction and was sitting idly at her desk. *Id.* at 15-16 ¶ 48. Plaintiff decided to show Ms. Tapia where certain offices were and provided instruction on how to accomplish certain tasks. *Id.* Plaintiff alleges that she was later scolded for this behavior. *Id.* On May 2, 2022, Plaintiff alleges that Defendant Herman told Ms. Tapia never to ask Plaintiff work-related questions, and instead, to ask a relatively untrained employee. *Id.* at 16 ¶ 51.

Also on May 2, 2022, Ms. Wheeler, Plaintiff's new supervisor, facilitated a conversation between Plaintiff and Ms. Fernandez regarding the formal counseling Plaintiff received related to their conversation in November. *Id.* at 16 ¶ 50. Plaintiff alleges that the conversation went well, and a resolution was reached. *Id.* However, Ms. Wheeler was later reprimanded by Defendant Herman for facilitating the conversation and defending Plaintiff. *Id.*

At some point in April or May 2021, Ms. Thalho resigned. Defendant Herman allegedly threw a going away party and asked Ms. Thalho to reconsider her decision. *Id.* at 16 ¶ 49.

On May 31, 2021, Plaintiff was informed that her ADID claim against Defendant Herman was unsubstantiated. *Id.* at 16 ¶ 52.

On June 2, 2022, Plaintiff received another round of informal counseling for questioning a statement Defendant Herman made during a meeting. *Id.* at 16 ¶ 53. Plaintiff alleges that during

the meeting Defendant Herman had trivialized the amount of work Plaintiff had done, and that Plaintiff had questioned the reasonableness of Defendant Herman's expectations. *Id.*

Another white employee resigned on June 2, 2022. *Id.* at 16 ¶ 54. Plaintiff alleges that Defendant Herman met with the employee to discuss the decision to resign and asked him to reconsider. *Id.* In total, Plaintiff alleges that Defendant Herman attempted to convince two white employees and Ms. Thalho to reconsider their resignations. In contrast, Plaintiff alleges that when Mr. Williams later resigned, there was no request for him to reconsider. *Id.* at 15 ¶ 44. Similarly, Plaintiff alleges that she was not asked to reconsider her own resignation. *Id.* at 17 ¶ 55.

On June 3, 2022, Plaintiff sent two emails indicating her intention to resign. *Id.* at 17 ¶ 55. Her last day of employment was June 20, 2022. *Id.* at 18 ¶ 62; *see also* Dkt. No. 1-5 at 1-3. In the Complaint, Plaintiff cites humiliation, harassment, retaliation, micro aggressions, belittlement, and discriminatory acts as the reasons for her decision and characterizes her resignation at "involuntary." *Id.* at 17 ¶ 55. Plaintiff alleges that on June 10, 2022, she and Defendant Herman met with Mr. McKay to discuss the resignation, but that Plaintiff felt she could not express the reason for her resignation because Defendant Herman was present and other employees could hear the conversation. *Id.* at 17 ¶ 56. On the same day, Plaintiff alleges that Defendant Herman offered Plaintiff's position to Ms. Thalho, who was not qualified for the position. *Id.* at 17 ¶ 57. Plaintiff met with Human Resources on June 17, 2022 to complete an exit questionnaire. *Id.* at 17 ¶ 61. In the questionnaire, Plaintiff indicated that she was resigning because she was harassed by Defendant Herman and was dissatisfied with her working conditions. Dkt. No. 1-5 at 11. She specifically noted that, "there's no free expression of new ideas, thoughts, or opinions," that "other employees are told not to talk to [Plaintiff][,]" and that there is a "divisive environment[.]" When asked what would make the workplace a better place to work, Plaintiff wrote an "inclusive work

environment where new thoughts, ideas, and perspectives are welcomed and considered, avoidance of staff splitting, to not use formal and informal counseling as an intimidation tactic, avoidance of comparisons of employees' performances, avoidance of favoritism, [and] treating positions w[ith] respect." *Id.*

On June 14, 2022, Plaintiff filed simultaneous complaints against Defendants with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights, alleging discrimination based upon her race/color, sex, and retaliation.[4]  *See* Dkt. No. 15-2; Dkt. No. 16 at 4 ¶ 3.  In the complaints, Plaintiff alleged most of the facts that she alleges before this Court, including a near daily description of Defendant Herman's behavior, Defendant Herman's alleged comments regarding Plaintiff's Hispanic identity, Plaintiff's reports to Mr. McKay, her more formal complaints, and the comparisons between Plaintiff and Ms. Thalho.  *Id.*

Plaintiff alleges that in response to the exit interview questionnaire, Defendant Herman retaliated against Plaintiff by marking Plaintiff absent without leave ("AWOL") for her last days of employment.  Dkt. No. 1 at 17 ¶ 61.  Plaintiff alleges this was an improper attempt to ensure she was not paid for her final days of work.  *Id.* at 18 ¶ 62; Dkt. No. 16 at 4 ¶ 1.  On July 1, 2022, Plaintiff received a call from her children stating that local police were at Plaintiff's home to perform a "wellness check" and that her supervisor had requested the check in.  *Id.*  Plaintiff was

---

[4] The Court takes judicial notice of Plaintiff's EEOC and New York State Division on Human Rights complaints, as well as the resulting Determination and Order after Investigation and Determination and Notice of Rights to the Plaintiff, because the documents are either incorporated by reference in the Complaint or attached thereto.  *See* Dkt. No. 1 at 20, 22-23; *see also Gray v. Onondaga-Cortland-Madison BOCES*, 5:16-cv-973 (GLS/TWD), 2018 WL 1804694, at *2 n.6 (N.D.N.Y. Apr. 13, 2018).  Moreover, courts in this Circuit have held that such documents constitute records of state administrative procedures of which courts may take judicial notice.  *See, e.g., Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 217 (E.D.N.Y. 2018) (listing cases); *Elboute v. Highgate Hotels, L.P.*, 1:22-cv-7609 (MKV), 2023 WL 5152236, at *1 n.1 (S.D.N.Y. Aug. 10, 2023).

not home for the wellness check but alleges that the police officers' presence upset her children and caused embarrassment with neighbors. *Id.* Plaintiff went to the police station and inquired into the reason for the wellness check. *Id*. The police told Plaintiff that they were told by her supervisor that she didn't report to work and that they hadn't heard from Plaintiff since June 10, 2022. *Id.* Plaintiff "was confused" by this report because her last day of work was June 20, 2022. *Id.* Plaintiff was told by Ms. Grant that Defendant Herman had attempted to mark Plaintiff as AWOL for her last days on the job. *Id.* Plaintiff confirmed with the Human Resources Director that Defendant Herman initiated the wellness check. *Id.*

On April 17, 2024, the New York State Division of Human Rights issued a Determination and Order after Investigation which dismissed Plaintiff's complaint based on a lack of evidence. *See* Dkt. No. 15-3. On June 17, 2024, the EEOC adopted the findings of the New York State Division of Human Rights and issued a Determination and Notice of Rights to the Plaintiff. Dkt. No. 1 at 22-23. Plaintiff was issued a Right-to-Sue Letter. *Id.*

Plaintiff generally alleges that, starting in October 2021, she experienced hair loss because of the stress of her position with DOCCS. *Id.* at 15 ¶ 43. She also alleges that Defendant Herman's conduct frequently brought her to tears. *Id.* at 8 ¶ 11, 10 ¶ 21, 12 ¶ 32.

Plaintiff filed the Complaint with this Court on August 23, 2024. *See generally* Dkt. No. 1. The Court construes the Complaint to allege five claims under Title VII: 1) unequal terms and conditions of employment, 2) failure to promote, 3) constructive discharge, 4) hostile work environment, and 5) retaliation. *See* Dkt. No. 1 at 18-20. Defendants move to dismiss based on a

failure to exhaust administrative remedies and a failure to state a claim.  *See generally* Dkt. No. 15.[5]

## III.    STANDARD OF REVIEW[6]

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of a party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).   This presumption, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are "integral" to the pleadings even if they are neither physically attached to, nor incorporated by reference into, the pleadings.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers*, 282 F.3d at 152-53).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (alteration in original) (quotation omitted).  Under this standard, a pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

---

[5] Defendants initially also moved to dismiss based on timeliness, but based on a clarification of the dates of certain allegations in the Complaint, Defendants have withdrawn the argument.  Dkt. No. 18 at 4.

[6] Because there are no live arguments as to jurisdiction, the Court includes only the standard for a motion pursuant to Rule 12(b)(6).

*Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *id.* at 570.

"[I]n a *pro se* case . . . the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting, *inter alia*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).  The Second Circuit has held that courts are obligated to "'make reasonable allowances to protect *pro se* litigants'" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id*. (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

## IV.    DISCUSSION

### A.  Claims Against Defendant Herman

First, Defendants argue that the claims against Defendant Herman must be dismissed because "[i]t is well settled that individuals are not subject to liability under Title VII."  Dkt. No. 15-4 at 10.  In response, Plaintiff asserts that she has stated a claim against Defendant Herman in an official capacity,  Dkt. No. 16 at 18, and that Defendant Herman "aided and abetted" DOCCS in its discrimination and harassment, Dkt. No. 19 at 1.[7]  The Court agrees with Defendants.

"Title VII claims . . . against [an] individual defendant[] fail as a matter of law." *Mussallihattillah v. McGinnis*, 684 Fed. Appx. 43, 47 (2d Cir. 2017) (citing *Patterson v. County*

---

[7] Though not provided for in the initial briefing schedule set by the Court on October 15, 2025, *see* Dkt. No. 15, Plaintiff filed a response to Defendants' reply on November 25, 2024, *see* Dkt. No. 19.  Given the "special solicitude" afforded to *pro se* plaintiffs, the Court considers the

*of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)).  That Plaintiff presses her claims against Defendant Herman in her official capacity does not alter the result because "[i]ndividuals are also not liable in either their individual or official capacities under Title VII."  *Milione v. City Univ. of New York*, 950 F. Supp. 2d 704, 709 (S.D.N.Y. 2013), *aff'd*, 567 F. App'x 38 (2d Cir. 2014).  Nor does Plaintiff's reference to "aiding and abetting" warrant any consideration.  While plaintiffs may assert claims based on city and state human rights laws against individual defendants based on aiding and abetting theories of liability, they may not do so under Title VII.  *See Asuncion v. Alexander*, 20-CV-4061 (NSR), 2020 WL 4207392, at *1, n.1 (S.D.N.Y. July 21, 2020). Therefore, the claims against Defendant Herman, all of which are brought pursuant to Title VII, are dismissed with prejudice.

### B.  Allegations Before and After Formal Employment

Defendants also argue that the Court should ignore "incidents alleged to have occurred outside of the period of Plaintiff's employment" because such events are not covered by Title VII. *See* Dkt. No. 18 at 4; Dkt. No. 15-4 at 13.  In response, Plaintiff argues that these events, including the allegedly erroneous AWOL determination, should be considered because the incidents "affect[ed] her employment[.]"  Dkt. No. 16 at 18.

Defendants point to no law in support of its argument that the Court should not consider allegations which occurred outside of Plaintiff's formal period of employment.  Indeed, the law suggests that courts do not generally impose such strict parameters.  Title VII liability may attach to events outside of a plaintiff's period of formal employment so long as the plaintiff's allegations pertain to a "term, condition, or privilege of employment" which is received "after employment

---

submission. *See Barker v. Aramark Uniform & Career Apparel, LLC*, 19-CV-2710 (PKC) (SMG), 2020 WL 5645092, at *4 n.7 (E.D.N.Y. Sep. 22, 2020) (considering similar document filed by *pro se* plaintiff).

terminates." *Hishon v. King & Spalding*, 467 U.S. 69, 77 (1984).  Indeed, the Second Circuit has recognized that Title VII extends to protect "potential, current, or past employee[s] of the employer." *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 374 (2d Cir. 2006) (citation and internal quotation marks omitted); *see also Adams v. Legendary Marketing*, 1:23-CV-6167 (LTS), 2023 WL 6444843, at *3 (S.D.N.Y. Oct. 3, 2023) ("Title VII prohibits an employer from discriminating against an employee *or a potential employee*" (emphasis added)); *Rajcoomar v. Bd. of Educ.*, 16 CV 1682 (VB), 2017 WL 980616, at *6 (S.D.N.Y. Mar. 13, 2017) (considering allegations that employer hindered retirement benefits after plaintiff's employment in retaliation for plaintiff's claims of discrimination).

The Court has identified two allegations which fall outside the period of Plaintiff's employment.  First, the Complaint alleges that when Plaintiff received her job offer on August 21, 2021, Defendant Herman told her that she was not the first choice for the position, and that she could not be considered to fill a recent vacancy.  Dkt. No. 1 at 6 ¶¶ 2-3.  Second, the Complaint alleges that Defendant Herman caused Plaintiff to be marked "AWOL" on her last days of employment, which eventually led to a wellness check from police which occurred after Plaintiff's formal resignation and last day of work.  *Id.* at 18.  Plaintiff alleges that Defendant Herman did so in retaliation for Plaintiff's critical exit-interview and "as a way for the Plaintiff not to be compensated for her last days of employment[.]"  Dkt. No. 16 at 18 ¶ 62.  As these allegations pertain to Plaintiff's hiring, potential promotion, and compensation, undoubtedly "term[s]" of her employment, the Court finds them to be within the scope of Plaintiff's claims.  *Hishon*, 467 U.S. at 77.

### C.  Exhaustion

Next, Defendants argue that certain claims are barred because they were not exhausted, including her discrimination claims based on national origin, her unequal terms and conditions of

employment claim, her constructive discharge claim, and her hostile work environment claim. Dkt. No. 15-4 at 14.  In response, Plaintiff points to her two complaints with the EEOC and the New York State Department of Human Rights, which largely assert the same factual allegations presented to this Court.  *See* Dkt. No. 15-2.

To assert a timely and exhausted Title VII claim, a plaintiff must: "(1) file a timely charge with the EEOC, (2) receive an EEOC right-to-sue letter, and (3) file an action within 90 days of receipt of that letter."  *Collier v. Boymelgreen Dev.*, No. 06 CV 5425(SJ), 2007 WL 1452915, at *2 (E.D.N.Y. May 17, 2007) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996)).  Exhaustion of administrative remedies is not jurisdictional, but instead, is a "precondition to bringing a Title VII claim in federal court."  *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000) (citation and internal quotation marks omitted).  While a plaintiff typically must bring their claims before the EEOC prior to filing suit in federal court, "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency."  *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir.2001) (*per curiam*) (citation omitted).  "There are three types of claims which may be considered 'reasonably related' for purposes of satisfying the exhaustion requirement: (1) claims that 'fall within the scope of the [administrative agency's] investigation which can reasonably be expected to grow out of the charge of discrimination;' (2) claims that allege retaliation for filing an administrative charge; and (3) claims that allege 'further incidents of discrimination carried out in the same manner alleged in [the administrative] charge.'" *Wilson-Richardson v. Regional Transit Serv., Inc.*, 948 F. Supp. 2d 300, 305 (W.D.N.Y. 2013) (brackets in original) (quoting *Carter v. New Venture Gear, Inc.*, 310 Fed. Appx. 454, 455 (2d Cir. 2009) (summary order)).  The Second Circuit has held that the inquiry into whether alleged conduct

is reasonably related to an EEOC complaint, and therefore whether it is properly brought in federal court, should "focus . . . on the factual allegations made in the [EEOC] charge itself" and whether those allegations "gave that agency adequate notice to investigate" the federal claims. *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir.2006) (internal quotation marks omitted) (quoting *Deravin v. Kerik*, 335 F.3d 195, 201-02 (2d Cir.2003)).

The Court finds that Plaintiff "either expressly raised the grounds for her [claims] in her EEOC charge, or the allegations asserted in her federal complaint are reasonably related to those raised in the EEOC charge[,]" and therefore, "Plaintiff has administratively exhausted her claims[.]" *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 639 (W.D.N.Y. 2014). Though Plaintiff did not list discrimination based on national origin in the EEOC complaint, her submissions before this Court make clear that the claim is premised on the allegations that Defendant Herman questioned Plaintiff's self-reported status as Hispanic based on Plaintiff's hair, skin complexion, name, and inability to speak fluent Spanish. Dkt. No. 19 at 3. These allegations were included in the EEOC complaint, and therefore, this Court finds that the discrimination claims based on national original are reasonably related to the claims raised in the EEOC complaint. *See* Dkt. No. 15-2 at 7. Similarly, though Plaintiff did not explicitly raise her unequal terms and conditions of employment, hostile work environment, and constructive discharge claims in the administrative proceedings, the Court finds that the EEOC was provided sufficient notice to investigate these bases for relief based on the allegations contained in the EEOC complaint. *Id.* at 6 (alleging unequal treatment with Ms. Thalho based on participation in a Hispanic Heritage Month meeting); *id.* at 7-9 (alleging verbal humiliation, baseless disciplinary actions, and shaming); *id.* at 9 (alleging resignation was caused by "constant humiliation, harassment, retaliation, micro aggressions, belittlement, [and] discriminatory acts"). In sum, the Court finds that Plaintiff presented the EEOC

21

with the very same factual allegations she relies upon in this Court to support the contested claims.[8]

Therefore, her claims were properly exhausted.[9]

### D. Discrimination Claims

The Court proceeds to the legal merits of Plaintiff's allegations. Generally, a plaintiff asserting a Title VII discrimination claim must allege that she "(1) belongs to a protected class, (2) is qualified for the position at issue, (3) h[er] employment was terminated or [s]he suffered another form of adverse action, and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination." *Phipps v. Northern Rivers*, 1:21-CV-1036 (BKS/CFH), 2022 WL 909095, at *5 (N.D.N.Y. Mar. 29, 2022) (citing *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)). At the motion to dismiss stage, plaintiffs must merely provide "minimal support for the proposition that the employer was motivated by discriminatory intent." *Johnson v. Andy Frain Servs., Inc.*, 638 F. App'x 68, 70 (2d Cir. 2016). An inference of discrimination can be established by allegations regarding "preferential treatment given to similarly situated individuals or remarks that convey discriminatory animus." *Perry v. State of New York Dep't of Labor*, No. 08 Civ. 4610,

---

[8] Though Defendants do not argue that Plaintiff has not exhausted her retaliation claim to the extent that it relies on the allegations of a wellness visit from police, the Court notes that these allegations are not included in the administrative complaints because they occurred subsequent to their filing. Regardless, the allegations are properly exhausted because they are reasonably related to the other allegations of Defendant Herman's retaliatory conduct included in the administrative complaints. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) (reversing district court's exclusion of allegations relating to employer's retaliatory refusal to recommend plaintiff for another job after she was fired because "[a]n investigation into those claims of retaliation explicitly cited in the charge could 'reasonably be expected' to yield evidence of other possible acts of retaliation that occurred around the same time").

[9] The Court notes that Plaintiff's *pro se* status also weighs in favor of considering all the allegations. *See, e.g., Tompkins v. Allied Barton Sec. Serv's*, No. 09 Civ.1954(RMB)(JLC), 2010 WL 3582627, at *10 (S.D.N.Y. Aug. 2, 2010) (noting pro se status in determination that the disputed allegations were reasonably related to the EEOC complaint).

2009 WL 2575713, at *2 (S.D.N.Y. Aug. 20, 2009) (citing *Patane*, 508 F.3d at 112), *aff'd,* 398 F. App'x 628 (2d Cir. 2010).

Here, Plaintiff alleges discrimination through unequal treatment, a failure to promote, constructive discharge, and a hostile work environment based on race, sex,[10] and national origin. *See* Dkt. No. 1.[11]   Defendants contests only the third and fourth elements of Plaintiff's discrimination claims: the presence of an adverse action and a plausible inference of discrimination.   Dkt. No. 15-4 at 14-20.   Because the allegations supporting an inference of discrimination differ slightly for each of the alleged adverse actions, the Court evaluates whether Plaintiff has stated a claim in relation to each adverse action independently.

### i. Unequal Treatment

First, Plaintiff alleges that she was subjected to unequal terms and conditions of employment due to her race, sex, and national origin.   Dkt. No. 1 at 2.   Generally, to succeed on such a theory of Title VII discrimination, Plaintiff must allege "that 'there were other similarly situated employees, outside of the protected class, who engaged in conduct substantially similar to that of [P]laintiff but received preferential treatment.'"   *Vasquez v. City of New York – Office of Mayor*, 22-CV-05068 (HG) (VMS), 2024 WL 1348702, at *8 n. 15 (E.D.N.Y. Mar. 30, 2024) (quoting *Vanhorne v. N.Y.C. Transit Auth.*, 273 F. Supp. 2d 209, 215 (E.D.N.Y. 2003)).   "An

---

[10] At the start, the Court notes that the Complaint is devoid of any factual allegations which might raise an inference of discrimination based on sex.   Therefore, the Court dismisses the discrimination claim to the extent it asserts discrimination based on sex.   To the extent that the parties dispute whether the Complaint alleges a separate "failure to train" claim of discrimination, the Court includes such a claim in its discussion of unequal treatment and a hostile work environment.   *See Tassy v. Buttigieg*, 51 F. 4th 521, 530 (2d Cir. 2022).

[11] Though the Complaint also lists "retaliation" as a form of discrimination, given the difference in the core elements of such a claim and the varying standard of "adverse action[,]" in the retaliation context, the Court addresses retaliation separately.   *See, e.g., Rother v. DOCCS*, 970 F. Supp. 2d 78, 96 (N.D.N.Y. 2013) (describing the retaliation standard for an adverse action as "lesser" when compared to the discrimination standard).

employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Abdul-Hakeem v. Parkinson*, 523 Fed. Appx. 19, 20 (2013) (summary order) (citation omitted). Such a claim requires allegations of "discrete act[s]" which are sufficient, on their own, to constitute an "adverse employment action[.]" *Tassy*, 51 F. 4th at 529.

Here, Plaintiff points to Ms. Thalho and the white employees who were hired during her employment as a "similarly situated employees[.]" Dkt. No. 16 at 26. Plaintiff asserts these employees were given "preferable treatment" through "promotions, working conditions, favoritism, assignments, and asking for their reconsideration when they submitted resignations." *Id.* More specifically, the Complaint alleges that Ms. Thalho was allowed to participate in meetings when Plaintiff was not despite Plaintiff's more relevant job responsibilities, that Plaintiff was more severely criticized for asking questions during training than Ms. Thalho, that Defendant Herman vocally and repeatedly expressed a preference for Ms. Thalho's work, and that Defendant Herman requested that Ms. Thalho and two resigning white employees reconsider their decisions to resign while not offering the same level of concern towards Plaintiff's resignation.

None of these comparators constitute "similarly situated employees," and therefore, the Court dismisses Plaintiff's unequal terms and conditions claim. Even reading the Complaint in the light most favorable to Plaintiff, the Court cannot avoid the conclusion that Plaintiff was subject to differing performance standards. Ms. Thalho is alleged to hold the position of Administrative Assistant 1. Dkt. No. 1 at 6 ¶ 4. The other employees held the positions of EOS3 and "OA2." *Id.* at 11 ¶ 31, 16 ¶ 54. Plaintiff was hired as an EOS1. *Id.* at 3. Beyond the titles alone, the Complaint frequently alludes to varying job responsibilities. Plaintiff alleges that she was criticized specifically for "not working to the level of an 18." Dkt. No. 1 at 8 ¶ 11. She also alleges that Ms.

Thalho's job responsibilities included answering the phones, while her job responsibilities did not. *Id.* at 6-7 ¶ 7. Finally, Plaintiff alleges that Ms. Thalho was not qualified to take Plaintiff's job after her resignation, suggesting that Ms. Thalho held a subordinate position. *Id.* at 17 ¶ 57. These distinctions are especially important where, as here, much of the alleged unequal treatment (participation in meetings, comparison of work product, varying reactions to resignations) may all be driven, at least in part, by varying positions of employment. *See Phipps*, 2022 WL 909095, at *6 ("it is unclear how plaintiff would be similarly-situated to [the comparator], a subordinate employee").

Even if Plaintiff had adequately alleged similarly situated employees, Plaintiff's specific allegations of unequal terms and conditions of employment do not amount to adverse employment actions, a prerequisite for any Title VII discrimination claim. *See Feingold*, 366 F.3d at 152. The Second Circuit has found that where a plaintiff alleged an employer discriminatorily "(1) increased her workload, (2) shortened her deadlines, (3) required her to work on weekends, [and] (4) disciplined her for making minor errors," among other discrete acts, the plaintiff "fail[ed] to state materially adverse changes in the terms and conditions of her employment[.]" *Henriquez v. Times Herald Record*, 165 F.3d 14, 14 (1998) (summary order). Other courts in this circuit have similarly found that allegations of unequal treatment like Plaintiff's, including counseling, do not amount to adverse actions capable of carrying a discrimination claim based on discrete acts of unequal treatment. *See Grimes v. Sil*, 19-cv-01066 (AMD) (VMS), 2020 WL 1516459, at *7-8 (E.D.N.Y. Mar. 29, 2020) (finding allegations that plaintiff was unequally subjected to disciplinary "counseling" insufficient); *Ziyan Shi v. N.Y. Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019) (finding allegations about "counseling memoranda . . . insufficient to allege an adverse employment action" under a more permissive standard); *Smith v. City of New*

*York*, 385 F. Supp. 3d 323, 334 (S.D.N.Y. 2019) (finding allegations of critical evaluation insufficient); *Lee v. Starwood Hotel*, 14 Civ. 5278 (KPF), 2016 WL 3542454, at *14 (S.D.N.Y. June 22, 2016) (finding allegations of "favoritism" insufficient).  As such, Plaintiff has failed to state a claim based on unequal terms and conditions of employment.

### ii. Failure to Promote

Plaintiff also alleges discriminatory failure to promote.  Unlike the alleged discrete acts of unequal treatment discussed above, "discriminatory failure to promote falls within the core activities encompassed by the term 'adverse actions[.]'"  *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).  To allege a Title VII claim based on a failure to promote, "[a] specific application [for a particular vacancy] is required 'to ensure[] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer.'"  *Petrosino v. Bell Atl.*, 385 F.3d 210, 226–27 (2d Cir. 2004) (quoting *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998)).  However, Plaintiff may be excused from alleging a "specific application" if she demonstrates that "(1) the vacancy at issue was not posted, and (2) [she] either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer."  *Id.* at 226-27.

Here, Plaintiff alleges that she applied for, and was denied, a promotion on two occasions.  First, on the day she was offered the EOS1 position, Plaintiff asked if she could be considered to fill a recently vacant EOS3 position.  Dkt. No. 1 at 6 ¶ 3.  In response, Defendant Herman informed Plaintiff that she could not be considered based on mandatory procedures set by the Civil Service and because she needed one year of state service experience.  *Id.*  Second, on October 15, 2021, Plaintiff applied for an EOS2 position that was posted.  *Id.* at 10 ¶¶ 19, 22.  According to the Complaint, Defendant Herman advocated for bypassing interviews for the EOS2 position because

Plaintiff had been referred by Human Resources for an interview. *Id.* The Complaint asserts that Plaintiff was not offered an interview and was not given the EOS2 position. *Id.*

The Court finds that the first alleged request for consideration in relation to the EOS3 position fails to state a claim because "[m]erely expressing an interest in a position is insufficient to support a failure to promote claim." *Sethi v. Narod*, 12 F. Supp. 3d 505, 525 (E.D.N.Y. 2014). Plaintiff merely alleges that she asked to be considered to fill an opening left by a previous employee in a single email prior to her official start in the EOS1 position. Plaintiff does not allege that Defendants were accepting job applications for the position at the time, nor that she ever followed up about applying through the procedures identified by Defendant Herman. The Court also finds that the exception to the "specific application" rule does not apply. Assuming that the EOS3 position "was not posted," Plaintiff does not allege that she attempted to apply for the position "through informal procedures endorsed by the employer." *Petrosino*, 385 F.3d at 227. Instead, Plaintiff alleges that she was told her request would circumvent standard procedures.

However, the Court finds that Plaintiff's allegations relating to her application to the EOS2 position state a claim for discriminatory failure to promote. Construing the Complaint in her favor, Plaintiff alleges that the EOS2 position was posted and she applied through the standard procedures. Plaintiff also alleges that Human Resources referred her application for an interview, providing plausible support for the notion that Plaintiff was qualified for the position. Therefore, Plaintiff has plausibly identified an adverse action: the denial of her application for the EOS2 position.

The Court also finds that Plaintiff has alleged facts, and even provided documentary support, capable of supporting an inference of discrimination in relation to the EOS2 position. Plaintiff has presented evidence which indicates that Mr. McKay, Defendant Herman's supervisor,

questioned Defendant Herman's decision not to interview Plaintiff. *See* Dkt. No. 1-5 at 16. In a November 15, 2021 email relating to "EOS2 Resumes[,]" Mr. McKay stated that "not granting [Plaintiff] an interview will create further moral concerns. I realize there are other issues at play, but we need to ensure that we are being objective, fair and equitable." *Id.* Though the Court lacks context for this email, at this stage, it draws the reasonable inference that Mr. McKay was concerned that the decision not to interview Plaintiff was driven by "[in]equitable" factors such as discrimination. The email also provides support for the notion that Defendant Herman was a decision-maker in relation to the application. Thus, Plaintiff's allegations that Defendant Herman expressed disbelief regarding Plaintiff's Hispanic identity due to her skin color and hair, and that Defendant Herman investigated her demographic information in an office database, similarly contribute to an inference of discrimination, even though the comments were not made in direct relation to the hiring process. *See* Dkt. No. 1 at 10 ¶ 2; *see also Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 409 (S.D.N.Y. 2014) (finding employer's comment "that someone with black skin should not have blonde hair," had an "undeniable racial overtone"). Less directly, Plaintiff also alleges that both Ms. Thalho, an Asian woman, and Plaintiff asked many questions throughout the start of their employment, and that only Plaintiff was criticized for asking questions. Dkt. No. 1 at 9 ¶ 16.[12] Taken together, the Court finds that Plaintiff has alleged the "minimal support" needed at this stage to establish an inference of discrimination in relation to the EOS2 application. *Johnson*, 638 F. App'x at 70; *see also Adeniji v. New York State Office of State Comptroller*, 18 Civ. 0761 (PAE) (BCM), 2019 WL 4171033, at *5 (S.D.N.Y. Sep. 3, 2019)

---

[12] Though Plaintiff's allegations that Defendant Herman demonstrated favoritism towards Ms. Thalho and certain white employees are insufficient, on their own, to state a claim for unequal treatment, the allegations remain relevant to the extent they contribute to an inference of discrimination in relation to Plaintiff's surviving claims.

(finding allegations that a deciding employer informed plaintiff that a job opportunity was in "a white neighborhood" and expressed surprise that "plaintiff was not Japanese given his surname" sufficient); *Claytor v. Wilkie*, No. 3:19-cv-01363 (VAB), 2020 WL 5097253, at *4 (D. Conn. Aug. 28, 2020) (finding allegations that plaintiff received a more critical performance evaluation than a white employee whose performance was worse than plaintiff's sufficient). Therefore, Plaintiff has plausibly alleged a claim of discriminatory failure to promote.

### iii.  Constructive Discharge

Next, Plaintiff alleges that she was subjected to constructive discharge. Constructive discharge is an adverse employment action capable of sustaining a Title VII discrimination claim because it is "functionally the same as an actual termination." *Notaro v. Fossil Indus., Inc.*, 820 F. Supp. 2d 452, 459 (E.D.N.Y. 2011) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004)). However, to succeed on a constructive discharge discrimination claim Plaintiff must allege that Defendants "intentionally create[d] a work atmosphere so intolerable that [Plaintiff] [was] forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003) (citation omitted). In assessing these claims, courts examine, "the employer's intentional conduct and the intolerable level of the work conditions." *Petrosino*, 385 F.3d at 229. In assessing intent, courts may consider direct evidence that an employer intended to force a plaintiff to leave, or other evidence which establishes that an employer's conduct was deliberate rather than the result of negligence. *Id.* at 229-30. In assessing working conditions, courts employ an "objective[]" standard and assess whether "a reasonable person in the employee's position" would be forced to quit involuntarily. *Borski v. Staten Island Rapid Transit*, 413 Fed. Appx. 409, 411 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Petrosino*, 385 F.3d at 230). Additionally, the Court must consider the allegations "on a cumulative basis." *Ingrassia v. Health & Hosp. Corp.*, 130 F. Supp. 3d 709, 724 (E.D.N.Y. 2015).

At this stage, the Court finds that Plaintiff has plausibly alleged a constructive discharge claim. First, the Complaint sufficiently alleges that Defendants acted with the required intent. Defendant Herman specifically stated that "she could get rid" of Plaintiff after the end of Plaintiff's first two months of employment. Dkt. No. 1 at 8 ¶ 11. Later, Defendant Herman allegedly conveyed to Plaintiff, through Ms. Grant, that she needed "to make a decision to leave and if [Plaintiff] w[ouldn't] make a decision, [Defendant Herman] w[ould] make one for her." *Id.* at 13 ¶ 37. The Second Circuit has found that similar statements directly evidence an intent to force Plaintiff to leave her job and might be enough to establish a constructive discharge claim on their own. *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding supervisor's comment that plaintiff "would be fired at the end of the 90-day probationary period" sufficient to establish intent and intolerable conditions). Regardless, Plaintiff also alleges that Defendant Herman refused to abate her treatment of Plaintiff even after Plaintiff reported her behavior to Mr. McKay and confronted Defendant Herman directly. Moreover, Plaintiff alleges that she repeatedly informed other employees and Defendant Herman's supervisor about the alleged conduct. As such, Defendants' conduct was at least intentional. *See Crosby v. Homeowner Assistance Servs. of New York*, No. 14-cv-3459, 2015 WL 3466855, at *2 (E.D.N.Y. Feb. 18, 2015) (finding allegations that supervisor did not halt abusive behavior after plaintiff rebuffed advances sufficient), *report and recommendation adopted by* No. 14-CV-3459, 2015 WL 3468606 (E.D.N.Y. June 1, 2015); *Champagne v. Columbia Dental, P.C.*, 3:18-cv-01390-VLB, 2019 WL 13123367, at *5 (D. Conn. May 8, 2019) (finding allegations of employer's indifference to misconduct sufficient).

Second, the Court finds that the cumulative allegations plausibly allege intolerable conditions. Defendant Herman allegedly used an office database for the non-work-related purpose

of questioning Plaintiff's Hispanic identity, belittled Plaintiff's work product and performance in front of other employees, insulted Plaintiff by telling her that "there isn't anything positive about the Plaintiff[,]" ignored Plaintiff's valid suggestions for improving efficiency, ignored Plaintiff's presence in various interactions, excluded Plaintiff from meetings for no valid reason, punished other employees who openly supported Plaintiff, subjected Plaintiff to baseless criticism for her handling of a COVID diagnosis, told Plaintiff and another employee that they needed to wear less revealing clothes, and threatened eventual termination. *See generally* Dkt. No. 1 at 6-18.[13] These facts generally align with circumstances which courts in this Circuit have found to suffice for a constructive discharge claim. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) (finding allegations that supervisor yelled, told plaintiff that "she would not survive[,]" and "held over her like a sword of Damocles a threat of immediate termination" sufficient); *Ingrassia*, 130 F. Supp. 3d at 725 (finding allegations that supervisor, in part, inappropriately read plaintiff's medical records, yelled at Plaintiff for no reason, and humiliated Plaintiff in front of colleagues sufficient). Though alone, these facts might not suffice, together, the Court finds that Plaintiff has

---

[13] The Court rejects Defendants' attempt to limit the Court's consideration of Plaintiff's allegations to the final three months prior to her resignation for purposes of the constructive discharge claim. It is true that a lengthy period between the onset of intolerable working conditions and a resignation may weigh against a constructive discharge claim. *See Harper v. Brooklyn Children's Center*, No. 12–CV–4545 (SJF)(GRB), 2014 WL 1154056, at *6 (E.D.N.Y. Mar. 20, 2014) (listing cases). However, given the Court's obligation to review the cumulative effect of Plaintiff's allegations of intolerable conditions which occurred through her employment, and the fact that Plaintiff was employed by Defendants for less than ten months, the Court finds allegations pre-dating the period immediately before her resignation to be relevant. *Id.* (noting that the plaintiff had not alleged any ongoing intolerable conditions). Indeed, the standard for constructive discharge "should [not] be raised to penalize fortitude and endurance. That an employee may choose to suffer abuse a little longer . . . may signal an absence of immediate options, or even an abundance of patience and tenacity, rather than acceptance of harassment as a way of life or as a normal condition of employment." *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 199 (S.D.N.Y. 2001).

plausibly alleged intolerable working conditions.  *See Chertkova*, 92 F.3d at 90 ("a reasonable person encounters life's circumstances cumulatively and not individually").

Beyond alleging intent and intolerable conditions, as with any claim under Title VII, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).  Plaintiff has met this minimal burden at the motion to dismiss stage.  Although the email in which Mr. McKay questioned whether Defendant Herman was acting inequitably is more directly related to failure to promote allegations, the Court finds Plaintiff has otherwise provided the support necessary to establish an inference of discrimination in relation to the constructive discharge claim.  Indeed, Defendant Herman's comments doubting Plaintiff's identity as Hispanic, along with Defendant Herman's alleged differential treatment of Ms. Thalho, provide stronger support for an inference of discrimination in the constructive discharge context because the allegations are "direct[ly] link[ed]" to the series of events which allegedly led to the constructive discharge.  *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 333 (S.D.N.Y. 2010).  More importantly, Plaintiff alleges that after she resigned, Defendant Herman immediately offered Ms. Thalho her position despite Ms. Thalho lacking the required qualifications.  Dkt. No. 1 at 17 ¶ 57.  The attempt to replace Plaintiff with a "less-qualified individual[] outside of Plaintiff's protected class[] [is] sufficient to give rise to an inference of discrimination." *Brophy v. Chao*, 17-CV-9527 (CS), 2019 WL 498251, at *5 (S.D.N.Y. Feb. 7, 2019) (listing cases). The Court also finds notable the fact that Defendant Herman's alleged mistreatment started, to some extent, before Plaintiff began her employment, thus partially negating Defendants' competing theory that Defendant Herman's conduct was motivated by Plaintiff's poor performance.  *See* Dkt. No. 1 at 6 ¶ 2 (alleging Defendant Herman told Plaintiff she was not the first choice for the position while conveying the

job offer).  Considering these alleged facts, the Court finds that the Complaint plausibly raises an inference of discrimination connected to the constructive discharge claim.  Therefore, Plaintiff has plausibly alleged a Title VII constructive discharge claim.

### iv. Hostile Work Environment

Finally, Plaintiff alleges that she was subjected to a hostile work environment.  "A hostile work environment constitutes an adverse employment action" for purposes of a Title VII discrimination claim.  *Rother*, 970 F. Supp. 2d at 92.  "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive - that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [race or national origin]."  *Patane*, 508 F.3d at 113.[14]  To survive a motion to dismiss, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse[.]"  *Id.*

The Court has already found that Plaintiff has plausibly alleged a constructive discharge claim.  Constructive discharge claims require "particularly pronounced hostile work environments[,]" and therefore, the Court finds that the Complaint also plausibly alleges a claim

---

[14] Beyond these elements, to assert a hostile work environment claim, a plaintiff must provide "a specific basis" for imputing liability to the employer, here DOCCS.  *See Maron v. Legal Aid Society*, 605 F. Supp. 3d 547, 561 (S.D.N.Y. 2022).  "An employer is subject to vicarious liability under Title VII when a supervisor 'with immediate (or successively higher) authority' creates an actionable hostile work environment."  *Dash v. Bd. of Educ. of City School Dist. Of New York*, 238 F. Supp. 3d 375, 386 (E.D.N.Y. 2017) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  The Court construes the Complaint to allege that Defendant Herman is the supervisor to Ms. Grant, who in turn is Plaintiff's supervisor.  The Complaint also makes clear that Plaintiff reported to Defendant Herman.  Therefore, the Court finds a specific basis for imputing liability to DOCCS.

for a hostile work environment.  *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 257 (S.D.N.Y.

2014); *see also Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)

(asserting the constructive discharge standard "is higher than the standard for establishing a hostile

work environment").

### E.  Retaliation

Plaintiff also asserts a Title VII claim for retaliation.  "Title VII ... prohibits an employer

from taking 'materially adverse' action against an employee because the employee opposed

conduct that Title VII forbids or the employee otherwise engaged in protected activity."

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011).  To assert a

claim of Title VII retaliation, a plaintiff must allege: "(1) participation in a protected activity; (2)

that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a

causal connection between the protected activity and the adverse employment action."  *Littlejohn

v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015).

### i.  Protected Activity

First, Plaintiff alleges several actions which constitute protected activity.  On October 1,

2021, Plaintiff alleges that she reported Defendant Herman's discriminatory behavior to Mr.

McKay, Defendant Herman's supervisor, and on October 6, 2021, Plaintiff alleges that she

informed Mr. McKay of additional concerns.  Dkt. No. 1 at 8-9 ¶¶ 12, 15.  She also alleges that

she had a follow up meeting with Mr. McKay on October 15, 2021.  *Id.* at 10 ¶ 18.  Beyond these

initial reports, Plaintiff attempted to report Defendant Herman to Mr. McKay and her own

supervisors, Ms. Grant and Ms. Wheeler, on other, more informal occasions, including on

September 23, 2021, November 29, 2021, and January 10, 2022.  *Id.* at 7-8 ¶ 10, 11 ¶ 25, 14 ¶ 40.

Similarly, on November 17, 2021, Plaintiff allegedly wrote in a memo regarding COVID in the

workplace that Defendant Herman was retaliating against her.  *Id.* at 10 ¶ 23.  Plaintiff also alleges

that she filed a complaint with ADID on December 21, 2021 which alleged discrimination, harassment, and retaliation. *Id.* at 12 ¶ 33. Finally, Plaintiff alleges that she reported Defendant Herman's alleged discrimination in her exit interview. *Id.* at 17 ¶ 61.[15] Each of these acts constitutes protected activity for purposes of a Title VII retaliation claim. *See, e.g., Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 239 (N.D.N.Y. 2010) ("Internal or informal complaints of discrimination on a basis prohibited by Title VII are protected activity."); *Lopez v. White Plains Hosp.*, No. 19-CV-6263 (KMK), 2022 WL 1004188, *13 (S.D.N.Y. Mar. 30, 2022) ("The caselaw is clear that plaintiffs engage in protected activity when they file internal or external discrimination complaints against their employer.").

###### ii. Knowledge

Second, Defendants do not appear to contest that they were aware of Plaintiff's internal complaints and exit questionnaire, nor could they. At the motion to dismiss stage, "general corporate knowledge" is sufficient, and Plaintiff "need not prove that the specific actors within an organization were aware that the plaintiff made allegations of retaliation." *Trivedi v. N.Y. Unified Court Sys. Office of Court Admin.*, 818 F. Supp. 2d 712, 736 (S.D.N.Y.2011). Here, Mr. McKay is alleged to have spoken with Plaintiff on several occasions regarding her complaints of discrimination. Moreover, the ADID complaint allegedly resulted in a formal determination that Plaintiff's discrimination claim was unsubstantiated. Dkt. No. 1 at 16 ¶ 52. Finally, Plaintiff's

---

[15] Defendants contend that Plaintiff did not raise discrimination in her final exit interview, and therefore, the exit questionnaire does not constitute protected activity. *See* Dkt. No. 15-4 at 16. However, while the questionnaire does not use the word "discrimination," it does complain about the lack of an "inclusive" environment, "staff splitting," and the lack of acceptance of differing "perspectives." Dkt. No. 1-5 at 11. Additionally, though the form completed and attached by Plaintiff itself does not specifically mention discrimination, the Complaint states that Plaintiff "met" with Human Resources and "noted" the discrimination. Dkt. No. 1 at 17 ¶ 61. Drawing all reasonable inferences, the Court finds these allegations sufficient to plausibly allege that Plaintiff reported Defendant's discriminatory conduct during her exit process.

submissions assert that Defendant Herman was "notified" of Plaintiff's critical exit questionnaire, and that she explicitly acknowledged her awareness of Plaintiff's November 17, 2021 memo noting retaliation in a formal counseling session.  Dkt. No. 16 at 27; Dkt. No. 1 at 12 ¶ 32. Therefore, Plaintiff has alleged knowledge of her protected activity.

### iii.  Adverse Actions

Third, Plaintiff adequately alleges adverse employment actions.  Under the third element, "[t]he scope of actions that may be materially adverse for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title VII's anti-discrimination provisions[.]"  *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 224-25 (E.D.N.Y. 2014).  In the retaliation context, a plaintiff need only allege an act that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Fincher*, 604 F.3d at 721 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Moreover, if individual acts of alleged retaliation do not, alone, constitute an adverse action, the Court must evaluate the acts "in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."  *Tepperwien*, 663 F.3d at 568.

Based on the allegations in the Complaint and Plaintiff's subsequent submissions, the Court construes the Complaint to allege that the following actions were taken in retaliation for Plaintiff's reporting activities: 1) informal and formal counseling, 2) the failure to promote Plaintiff to the EOS2 position, 3) Plaintiff's constructive discharge, and 4) marking Plaintiff AWOL for her last two days of employment.  *See* Dkt. No. 16 at 27.  Aside from the allegations related to counseling, Plaintiff's allegations are each sufficient, on their own, to allege adverse action.

As an initial matter, Plaintiff's several allegations involving informal and formal counseling do not amount, alone, to an adverse action, even under the more lenient retaliation standard.  The Second Circuit has held that "counseling" and "criticism" which does not "place [a

plaintiff] in an active disciplinary process" does not constitute an adverse action for purposes of retaliation. *Tepperwien*, 663 F.3d at 570. Other courts in this circuit have extended that holding to counseling based on "false or misleading" information. *See Ziyan Shi*, 393 F. Supp. 3d at 338. Here, even drawing all reasonable inferences in favor of Plaintiff, the Complaint makes clear that counseling in ODI was not connected to the Department's disciplinary process, and therefore, such acts do not constitute adverse actions on their own despite their alleged bias or falsity. *See* Dkt. No. 1 at 11 ¶ 25.

Plaintiff's remaining assertions of adverse action are more successful. First, as discussed above, the failure to promote Plaintiff to the EOS2 position constitutes an adverse action under the narrower standard in the discrimination context, and thus, it also constitutes an adverse action for purposes of retaliation. *See Wetzel v. Town of Orangetown*, 7:03-cv-9896-JGM, 2011 WL 13382679, at *4 (S.D.N.Y. Sep. 30, 2011).

Likewise, the Court has already found that Plaintiff has plausibly alleged a constructive discharge discrimination claim through the allegations of Defendant Herman's threats of termination accompanied by the alleged pattern of hostile conduct. Again, given the more lenient standard for an adverse action in the retaliation context, the Court finds that the allegations of constructive discharge suffice.[16] *See Civil Serv. Emps. Ass'n, Inc., Local 1000, AFSCME, AFL–CIO v. N.Y. Dep't of Parks, Recreation & Historic Pres.*, 689 F. Supp. 2d 267, 280 (N.D.N.Y.2010) (holding that the "adverse employment action" element of plaintiff's retaliation claim "includes

---

[16] The Court notes that its evaluation of the allegations in relation to whether constructive discharge constitutes an adverse action in the retaliation context is more limited in comparison to the discrimination context. The Court does not consider Defendant Herman's acts of hostility which predate the first alleged instance of known protected activity on October 1, 2021 because such acts could not have been taken in response to Plaintiff's reporting activity. However, the Court finds the remaining allegations sufficient, especially in light of Defendant Herman's alleged threats of termination, which occurred after Plaintiff's protected activity began.

discharge from employment by constructive discharge"); *see also Dall v. St. Catherine of Siena Medical Center*, 966 F. Supp. 2d 167, 194 (E.D.N.Y. 2013).

Finally, Plaintiff's allegation that she was wrongly marked AWOL for her final two days of employment constitutes an adverse action.  Courts in this circuit have generally found that "being charged with AWOL would not have dissuaded a reasonable worked from making or supporting a charge of discrimination[,]" and thus, does not constitute an adverse action for purposes of retaliation. *Johnson v. Lew*, No. 13-CV-1072, 2017 WL 3822047, at *14 (N.D.N.Y. Aug. 30, 2017).  However, in doing so, courts have relied on the fact that being marked AWOL, alone, does not injure the plaintiff.  *See Sosa v. New York City Dept. of Educ.*, 368 F. Supp. 3d 489, 520 (E.D.N.Y. 2019) ("The Complaint alleges no negative consequences resulting from the allegation of absenteeism."); *Johnson*, 2017 WL 3822047, at *14 ("[T]he record does not support the conclusion that Plaintiff was disciplined or that he was terminated, was demoted, or suffered any other employment-related consequences as a result of being charged with AWOL[.]"); *Jordan v. Potter*, No. 05-CV-3005, 2008 WL 11435760, at *11 (E.D.N.Y. May 20, 2008) ("The wrongful reporting of plaintiff as AWOL, which was adjusted approximately one (1) month later, and for which there was no evidence of injury or harm to plaintiff, does not constitute a materially adverse employment action.").  In contrast, despite alleging the AWOL notation was subsequently reversed, Plaintiff alleges that the charges of absenteeism resulted in police officers visiting her home to perform a "wellness check."  Dkt. No. 1 at 18 ¶ 62.  Plaintiff alleges that the wellness check caused embarrassment and humiliation and "devastated" her children. *Id.*  The Court finds it plausible that a reasonable employee would be dissuaded from reporting discrimination by a visit from police at their home, and therefore, the allegations related to being marked AWOL are sufficient to assert an adverse action.

Given the Court finds that several of the alleged retaliatory acts are sufficient, on their own, to constitute an adverse action for purposes of Title VII retaliation, the Court also finds that the acts, viewed in the aggregate, are sufficient.

### iv.   Causal Connection

Finally, Plaintiff plausibly alleges a causal connection between her protected activity and the alleged adverse actions.  To satisfy the causation element of a Title VII retaliation claim at this stage, Plaintiff "must plausibly allege that the retaliation was a but-for cause of the employer's adverse action."  *Mitchell v. Planned Parenthood of Greater New York, Inc.*, 745 F. Supp. 3d 68, 100 (S.D.N.Y. 2024) (quoting *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)).  However, such but-for causation "does not require proof that retaliation was the only cause of the employer's action."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  Instead, it merely requires that "the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.*   "Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity."  *Duplan*, 888 F.3d at 625; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) ("the but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . . through temporal proximity" (alteration in original) (quoting *Zann Kwan*, 737 F.3d at 845)).

First, Plaintiff plausibly alleges a causal connection between the failure to promote Plaintiff to the EOS2 position and Defendant Herman's retaliatory animus.  As discussed in relation to Plaintiff's discrimination claim based on the same job application, Plaintiff has attached emails from Mr. McKay which might suggest that Defendant Herman acted improperly in refusing to interview Plaintiff for the position.  *See* Dkt. No. 1-5 at 16.  While the Court has already found that Mr. McKay's email plausibly evidences discriminatory animus, it also finds that it plausibly suggests retaliatory animus.  *See Zann Kwan*, 737 F.3d at 846 (but-for causation "does not require

proof that retaliation was the only cause of the employer's action").  Even if the Court were not to consider the email, the refusal to interview Plaintiff for the EOS2 position occurred approximately a month after Plaintiff's initial reporting of Defendant Herman's conduct to Mr. McKay.  *See* Dkt. No. 1 at 8 ¶ 12, 10 ¶ 19.  At this stage, the allegations are sufficient to plausibly suggest that retaliatory animus caused the failure to promote to the EOS2 position.  *See Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 284 (S.D.N.Y. 2024) (finding a one-month timeframe "well within the window for temporal proximity").

Second, the Complaint sufficiently alleges a causal connection between Plaintiff's constructive discharge and Defendant Herman's retaliatory animus.  Although several months elapsed between the first of Plaintiff's protected activities and her ultimate resignation, the Complaint alleges extremely close temporal proximity between individual acts which allegedly led to the resignation and protected activity.  For example, Plaintiff alleges that on October 1, 2021, Plaintiff initially reported Defendant Herman to Mr. McKay, and on October 6, 2021, she reached out to Mr. McKay again to report on Defendant Herman's conduct in a meeting.  The next day, Plaintiff alleges that Defendant Herman subjected Plaintiff to informal counseling.[17]  Dkt. No. 1 at 9 ¶ 15.  Similarly, Plaintiff reported Defendant Herman's retaliatory conduct in a November 17, 2021 memo, and on December 17, 2021, Defendant Herman explicitly noted Plaintiff's allegations in that memo as part of the rationale behind a formal counseling session.  *Id.*

---

[17] Again, although counseling on its own is insufficient to establish an adverse action, the Court must examine Defendants' misconduct in the aggregate, including acts which alone would be insufficient to carry a claim.  *Tepperwien*, 663 F.3d at 570.  Therefore, this Court may consider the temporal proximity of counseling sessions with protected activity to assess causation.  *See Servello v. New York State Office of Children and Family Services*, 1:18-CV-0777 (LEK/DJS), 2019 WL 974972, at *10 (N.D.N.Y. Feb. 28, 2019) (assessing proximity of "the imposition of employee counseling" with plaintiff's initial complaint after determining that counseling, on its own, does not establish an adverse employment action).

at 12 ¶ 32.  Moreover, Defendant Herman allegedly threatened to terminate Plaintiff on January 3, 2022.  This threat came merely two weeks after Plaintiff's ADID complaint.  *Id.* at 12 ¶ 33, 13 ¶ 37.  More generally, Plaintiff alleges in her response that Defendant Herman's conduct became more severe after her first complaint to Mr. McKay.  Dkt. No. 16 at 27.  Based on a review of the Complaint, the Court finds that Plaintiff's assertion of escalation is not conclusory, but rather, is reflected in the facts alleged.  Prior to Plaintiff's reporting in October, 2021, the Complaint alleges that Defendant Herman ignored Plaintiff's contributions, frequently compared her to Ms. Thalho, excluded her from a meeting, belittled some of her work product, and insulted Plaintiff.  *See* Dkt. No. 1 at 6-8.  However, after the alleged protected activity, the Complaint details more formal and extreme conduct, such as repeatedly imposing baseless counseling, refusing to consider Plaintiff for the EOS2 position, an unfounded critical evaluation, researching Plaintiff's demographic information in a workplace database, commenting on Plaintiff's body type, restricting other employees' ability to speak with Plaintiff, and allegedly threatening termination if Plaintiff did not resign.  *Id.* at 8-18.  The Court finds the temporal proximity between certain key allegations and the protected activity, when paired with the alleged escalation, is sufficient, at this stage, to establish a causal connection between Defendant's retaliatory animus and the constructive discharge.  *See Blumstein-Torella v. New York City Dept. of Educ.*, 19-cv-3492 (ALC), 2023 WL 5097873, at *10 (S.D.N.Y. Aug. 9, 2023) ("Construing all ambiguities in Plaintiff's favor, that there seems to have been a sudden escalation in the disciplinary action taken against Plaintiff . . . following her formal discrimination complaints supports an inference that these actions could have been retaliatory.  This, combined with the temporal proximity between Plaintiff's protected

activity and Defendants' abrupt escalation in disciplinary measures against Plaintiff following that activity, is sufficient for the Plaintiff's retaliation claim to survive a motion to dismiss.").

Finally, as to the AWOL notation and the wellness check, Plaintiff alleges that she was informed by Defendant's Human Resources Director that Defendant Herman was responsible for initiating the wellness check.  Dkt. No. 1 at 18 ¶ 62.  Moreover, the wellness check occurred merely days after Plaintiff's final alleged protected activity: her exit questionnaire.  *Id.* at 17 ¶ 61.  Given that the Complaint alleges that Defendant Herman was personally responsible for the wellness check, and given the extremely close temporal proximity to the alleged protected activity, the Court finds that Plaintiff has plausibly alleged that the AWOL notation and wellness check were motivated by Defendant Herman's retaliatory animus.  *See Zann Kwan*, 737 F.3d at 845 (three-week period between complaint and termination sufficient to show causal connection).

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' motion to dismiss, Dkt. No. 15, is **GRANTED IN PART AND DENIED IN PART**; and the Court further

**ORDERS** that the claims against Defendant Herman are **DISMISSED with prejudice**; and the Court further

**ORDERS** that Plaintiff's Title VII Discrimination claim is **DISMISSED without prejudice** to the extent it asserts unequal terms and conditions of employment; and the Court further

**ORDERS** that Plaintiff's Title VII Discrimination claim is **DISMISSED without prejudice** to the extent it asserts discrimination based on sex; and the Court further

**ORDERS** that the remainder of Plaintiff's claims survive in accordance with this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the

parties in accordance with the Local Rules.[18]

**IT IS SO ORDERED.**


Dated: <u>June 30, 2025</u>
       Albany, NY

Anne M. Nardacci
U.S. District Judge

---

[18] The Clerk shall also provide Plaintiff with copies of all unreported decisions herein.